IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION

WILLIAM HATCHER                                              PLAINTIFF

v.                      Case No. 2:16-cv-00014 KGB

MDOW INSURANCE COMPANY                            DEFENDANT

**OPINION AND ORDER**

Before the Court are a motion for summary judgment filed by defendant MDOW Insurance Company ("MDOW") and a motion for partial summary judgment filed by plaintiff William Hatcher (Dkt. Nos. 26, 31). Mr. Hatcher has responded to MDOW's motion for summary judgment, and MDOW has replied (Dkt. Nos. 41, 45). Mr. Hatcher then requested leave from the Court to file a sur-reply, and MDOW filed a motion in opposition (Dkt. Nos. 46, 47). The Court allowed Mr. Hatcher to file a sur-reply (Dkt. No. 48).

MDOW has responded to Mr. Hatcher's motion for partial summary judgment, and Mr. Hatcher has replied (Dkt. Nos. 33, 38). On April 27, 2017, Mr. Hatcher filed a motion to supplement his motion for partial summary judgment (Dkt. No. 49). The Court granted the motion and allowed MDOW to respond to the supplemented motion (Dkt. No. 55). Mr. Hatcher then filed a supplement to his motion for partial summary judgment, and MDOW responded in opposition to the supplemented motion (Dkt. Nos. 59, 60).

For the following reasons, the Court grants MDOW's motion for summary judgment and denies Mr. Hatcher's motion for partial summary judgment (Dkt. Nos. 26, 31).

**I.**      **Factual And Procedural Background**

Mr. Hatcher owned a home in Forrest City, Arkansas, that was insured by MDOW (Dkt. No. 2, ¶¶ 6, 7). On July 14, 2015, the home caught fire (Dkt. No. 2, ¶ 9). Mr. Hatcher reported

the fire to MDOW and requested payment under the policy (Dkt. No. 2, ¶ 11). MDOW states that a dispute arose between the parties regarding the extent and amount of damage caused by the fire (Dkt. No. 4, at 2). Mr. Hatcher alleges that, "[i]nstead of paying the loss, MDOW has procrastinated, delayed, and frustrated [Mr. Hatcher]'s attempts to recover the insurance proceeds rightfully due to him." (Dkt. No. 2, ¶ 14). Mr. Hatcher contends that MDOW "initially valued the damage to the home at $40,550.02," but that, after he hired a lawyer, the damage estimate "increased by over $23,000, to $63,593.32." (Dkt. No. 43, at 5). Mr. Hatcher argues that defendants have improperly refused to pay the loss under the policy and that he is entitled to $97,080.00 in repair costs, $40,000.00 for loss of personal property, $10,000.00 for living expense since displacement, payment for debris removal and clean-up costs, a 12% statutory penalty, attorneys' fees, and punitive damages (Dkt. No. 2, ¶ 24).

Specifically, Mr. Hatcher's bad faith claim as set out in his complaint is that MDOW's actions "are so oppressive and malicious that they amount to bad faith. Accordingly, Plaintiff should be compensated for the mental anguish caused by MDOW's oppressive actions." (Dkt. No. 2, ¶ 28). Mr. Hatcher also seeks punitive damages as a result of MDOW's alleged actions as punishment and to deter MDOW and others from such conduct in the future (Dkt. No. 2, ¶ 29).

The following facts are taken from MDOW's statement of undisputed facts (Dkt. No. 28) and Mr. Hatcher's statement of undisputed fact (Dkt. No. 30), unless otherwise indicated.

Brett Ford is an independent adjuster with Central Adjustment Company and the person who prepared the initial damage estimate for MDOW after the July 14, 2015, fire. Mr. Ford inspected the damage to Mr. Hatcher's residence on July 15, 2015, and determined the damage to the home to be $41,550.02 pursuant to an "actual cash value" assessment. Mr. Hatcher disagreed with Mr. Ford's estimate and provided a repair estimate done by Mr. Hatcher's brother, Robert

Hatcher, who is a contractor. Mr. Hatcher adds that, "[p]laintiff obtained a repair estimate from a third party, Robert Hatcher, a licensed and respected general contractor, for **$92,895.00**. Plaintiff ALSO obtained an estimate from a Don Qualls of Qualls & Sons Construction Company, a competitor of Robert Hatcher's, for **$97,080.00**. Plaintiff had no previous relationship with Don Qualls. Qualls eventually performed the repairs on Plaintiff's home with the money eventually tendered by MDOW, but only after Plaintiff personally performed over $20,000 worth of repairs to the home." (Dkt. No. 42, ¶ 2) (emphasis in original).

MDOW states that, after it received from Mr. Hatcher his third party repair estimate, it then asked Mr. Ford to prepare a revised estimate based on the scope of damage outlined by Robert Hatcher's estimate. MDOW asserts that the actual cash value of the revised estimate was $63, 593.32. Mr. Hatcher states that he is not in a position to admit or deny what MDOW did or did not instruct Mr. Ford to do, but he contends that, "[i]n the affirmative, MDOW's statements of what they did and why they did it are not supported in the exhibits submitted by MDOW, and should not be considered by the Court as an undisputed fact. Plaintiff admits Ford issued a revised estimate of $63,593.32 ($29,301.68 less than Robert Hatcher's estimate, and $33,486.68 less than Don Qualls' estimate)." (Dkt. No. 42, ¶ 3).

MDOW states that the $63,593.32 estimate was prepared in an attempt to resolve the claim with Mr. Hatcher, not because MDOW agreed with the validity of scope of work encompassed by the estimates. In response to this alleged fact, Mr. Hatcher states that "[p]laintiff is in no position to either admit or deny why MDOW issued a revised statement of $63,593.32, $22,043.30 more than their original estimate. Plaintiff admits MDOW made a subsequent estimate of $63,593.32 to repair the home. Plaintiff denies MDOW made a revised estimate for any other reason than because Plaintiff hired an attorney. MDOW's statements

regarding why they made a revised estimate [are] not a fact that is supported by the evidence submitted in support of its Motion, and should not be considered as admitted by this Court, nor considered by the Court at this stage." (Dkt. No. 42, ¶ 4).

On November 23, 2015, MDOW unconditionally tendered two checks to Mr. Hatcher's attorney in the amounts of $63,593.32 for the actual cash value of the dwelling and $12,556.77 for the actual cash value of the damages to Mr. Hatcher's personal property. Mr. Hatcher was advised by MDOW that, if these amounts were insufficient to compensate him for the damages owed, then he was free to pursue a claim for those additional damages.

Carolyn Walker is an independent insurance agent who sold Mr. Hatcher his insurance policy with MDOW. Mr. Hatcher obtained the policy in 2011 and renewed the policy each year thereafter, up to and including 2015. MDOW asserts that it did not change the terms of Mr. Hatcher's insurance policy; it has always provided actual cash value coverage. Mr. Hatcher now disagrees and argues that "MDOW did materially change the policy of insurance by adding an 'actual cash value' endorsement. Plaintiff **DENIES** MDOW has always provided actual cash value coverage (the policy, absent the endorsement added after the contract of insurance was signed, provides for replacement coverage). Plaintiff is in no position to either admit or deny what Walker discussed with Plaintiff's ex-wife at the time the policy was originally issued in January 2011. Plaintiff admits the policy was renewed, but **DENIES** the policy never provided replacement coverage." (Dkt. No. 42, ¶ 7) (emphasis in original). MDOW states that Ms. Walker discussed the fact that the policy provided for actual cash value coverage with Mr. Hatcher's then-wife, Dottie Hatcher. Mr. Hatcher counters this point by stating that the policy was in Mr. Hatcher's name alone, and that "Dottie Hatcher, Plaintiff's ex-wife, is not a named insured under

the policy and is not a party to this case or contract at issue. Any conversations between Carolyn Walker and Dottie Hatcher are irrelevant to the present case." (*Id.*).

In support of his motion for partial summary judgment, Mr. Hatcher asserts that "the original policy of insurance allowed for 'replacement costs.'" (Dkt. No. 30, at 1). He maintains that when he "obtained the original contract of insurance there was no endorsement which changed the terms from 'replacement costs' to 'actual case value' (sic)." (Dkt. No. 30, at 2). Further, he contends that he never expressly agreed to the change, that the change was unilaterally accomplished by MDOW, that he received no consideration in return for the change, and that the change materially alters the contract and the obligations of MDOW in the event of a loss (Dkt. No. 30, at 2).

In response, MDOW asserts that the document Mr. Hatcher attaches to his motion for summary judgment is not a complete or accurate copy of Policy No. ARP_H120161-15 (Dkt. No. 35, at 1). Further, MDOW points out that that document does not match the policy that Mr. Hatcher attached to his complaint and alleged was a complete copy of the policy. It also does not match the document Mr. Hatcher produced in his initial disclosures, according to MDOW. In addition, MDOW submits the affidavits of James Gerzetich and John Todd in support of their contention that every insurance policy ever issued to Mr. Hatcher by MDOW beginning with the policy in 2011 was an actual cash value policy (Dkt. No. 33, Ex. 2; Dkt. No. 60, Ex. A).

The parties do not dispute that, in total and related to the July 2015 fire, MDOW unconditionally tendered checks to Mr. Hatcher valued at $82,190.09. MDOW states that Mr. Hatcher's decision to stay in a travel trailer on his own property was his own and that Mr. Hatcher was already staying in a travel trailer owned by his son, Travis Hatcher, at the time Mr. Ford spoke with him about the issue. Mr. Hatcher contends that he initially chose to stay in the travel trailer

5

on his property so that he could protect his property and with the belief that MDOW would quickly help him repair the home, but he admits that he was sleeping in the travel trailer when Mr. Ford came to inspect the premises on July 15, 2015, the day after the fire. MDOW states that Mr. Ford offered to reimburse Mr. Hatcher $40.00 a day for the use of the travel trailer, and Mr. Hatcher agreed. Mr. Hatcher denies this. He affirmatively states that Mr. Ford spoke with Travis Hatcher, Mr. Hatcher's son, regarding reimbursement for living in his travel trailer and that this is not a term about which Mr. Hatcher spoke with Mr. Ford or to which he expressly agreed (Dkt. No. 42, ¶ 9).

MDOW issued an advance to Mr. Hatcher for $5,000.00 on July 16, 2015. On August 7, 2015, MDOW issued a second check for $1,040.00 for additional living expenses. On November 27, 2015, MDOW issued two additional checks, one for $63,593.32 for the damages to the dwelling and one for $12,556,77 for the damages to Mr. Hatcher's personal property. All of the checks were issued unconditionally without any attempt to require Mr. Hatcher to settle his claim.

**II.     Standard of Review**

Summary judgment is proper when there is no genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Holloway v. Lockhart*, 813 F.2d 874, 878 (8th Cir. 1987). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989). However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of

a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Mr. Hatcher, the plaintiff, has also moved for partial summary judgment (Dkt. No. 31). Because Mr. Hatcher bears the burden of proof on his claims at trial, to prevail on his motion for partial summary judgment, he must first affirmatively show that, on all the essential elements of his claim, no reasonable jury could find for MDOW. *Celotex Corp.*, 477 U.S. 317, 331 (1986) (Brennan, J. dissenting); *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015); *Smith v. Ozmint*, 578 F.3d 246, 250 (4th Cir. 2009); *United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Cnty*. 941 F.2d 1428, 1438 (11th Cir. 1991); *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in the denial of summary judgment." *Leone*, 810 F.3d at 1153 (quoting 11 Jeffrey W. Stempel and Steven S. Gensler Moore's Fed. Practice, § 56.40[c][c] (3d Ed. 2015)).

### III. Analysis

#### A. MDOW's Motion For Summary Judgment

MDOW argues in its motion for summary judgment that Mr. Hatcher's bad faith claim should be dismissed because he is no longer entitled to have the allegations in his complaint accepted as true and has not shown any evidence that a reasonable jury would return a verdict in his favor on his claim for bad faith (Dkt. No. 26, ¶ 4). MDOW states that the parties simply disagree as to the amount that should be paid under the policy and that defendants have not refused to pay the claim (Dkt. No. 27, at 4). MDOW maintains that, under Arkansas law, a refusal to pay

7

a claim does not constitute the first party tort of bad faith when a valid controversy exists with respect to liability on the policy, *Strandberg v. Country Mut. Ins. Co.*, 2011 U.S. Dist. LEXIS 146416, 5-6 (D. Minn. Dec. 20, 2011) (citing *Cato v. Arkansas Mun. League Mun. Health Ben. Fund*, 688 S.W.2d 720, 723 (Ark. 1985)), and that such a dispute is what exists here. MDOW further argues that "the undisputed facts are that MDOW advanced Mr. Hatcher $5,000 on July 16, 2015. MDOW paid Mr. Hatcher $1,040 in additional living expenses August 7, 2015. Thereafter, it attempted to engage in discussions with Mr. Hatcher's attorney regarding resolution of the claim and ultimately tender[ed] unconditionally, $63,593.32 for the alleged damage to the dwelling and $12,556.77 on the contents claims." (Dkt. No. 28, ¶¶ 1, 5-6).

In response, Mr. Hatcher relies upon "the depositions of Mr. Ford (with attachments), MDOW's hired hand, and the Plaintiff, which [he contends] provide the requisite proof to submit the issue of bad faith to the jury." (Dkt. No. 43, at 2). Mr. Hatcher contends that, "[i]nstead of paying the loss, MDOW has procrastinated, delayed, and frustrated Plaintiff's attempts to recover the insurance proceeds rightfully due to him." (Dkt. No. 2, ¶ 14). Mr. Hatcher states that, "this case *will be* submitted to a jury. The facts supporting Plaintiff's claim for breach of contract similarly support the bad faith claim, and there are no distinct facts which would be excluded from the jury's purview in the event the Court finds Defendant's Motion well founded. Accordingly, even if the Court were inclined to grant Defendant's Motion, the appropriate action would be to reserve ruling on Defendant's Motion and submit this case to the jury in its entirety." (*Id.*). The Court disagrees. *See Reynolds v. Shelter Mut. Ins. Co.*, 852 S.W.2d 799 (Ark. 1993) (affirming trial court's grant of partial summary judgment on the claim for bad faith and punitive damages prior to jury trial on remaining claims).

8

Under Arkansas law, "an insurance company may incur liability for the first-party tort of bad faith when it affirmatively engages in dishonest, malicious, or oppressive conduct in order to avoid a just obligation to its insured." *Parker v. S. Farm Bureau Cas. Ins. Co.*, 935 S.W.2d 556, 561-62 (Ark. 1996); *Selmon v. Metropolitan Life Ins. Co.*, 277 S.W.3d 196, 201 (Ark. 2008) (quoting *Columbia Nat'l Ins. Co. v. Freeman*, 64 S.W.3d 720, 723 (Ark. 2002)). Mere negligence or bad judgment on the part of the insurer is insufficient. *Selmon*, 277 S.W.3d at 202. "The tort of bad faith does not arise from a mere denial of a claim; there must be affirmative misconduct." *Id.*

The Arkansas Supreme Court set forth the elements of a first-party bad faith claim in *Aetna Casualty & Surety Co. v. Broadway Arms Corp.*, 664 S.W.2d 463 (Ark. 1984):

> [I]n order to be successful a claim based on the tort of bad faith must include affirmative misconduct by the insurance company, without a good faith defense, and . . . the misconduct must be dishonest, malicious, or oppressive in an attempt to avoid its liability under an insurance policy. Such a claim cannot be based upon good faith denial, offers to compromise a claim or for other honest errors of judgment by the insurer. Neither can this type [of] claim be based upon negligence or bad judgment so long as the insurer is acting in good faith.

664 S.W.2d at 465; *see* Ark. Model Jury Instr., Civil, AMI 2304 (2015).

In addition,

> . . . a mistake on an insurance carrier's part or negligence or confusion or bad judgment will not suffice to substantiate the tort of bad faith. *See, e.g., Southern Farm Bureau Cas. Ins. v. Allen*, 326 Ark. 1023, 934 S.W.2d 527 (1996); *Parker v. Southern Farm Bureau Ins. Co.*, [232 Ark. 841, 341 S.W.2d 36 (1960)]; *Affiliated Foods Southwest, Inc. v. Moran*, [322 Ark. 808, 912 S.W.2d 8 (1995)]. For example, [the court has] held that nightmarish red tape, an abrupt attitude evidenced by an insurance representative about higher premium costs following cancellation of a group policy, and confusion over the referral process did not amount to bad faith. *See American Health Care Providers v. O'Brien*, [318 Ark. 438, 886 S.W.2d 588 (1994)]. Nor did the fact that an insurance company waited three months to investigate a claim. *See Reynolds v. Shelter Mut. Ins. Co.*, 852 S.W.2d 799, 802 (Ark. 1993).

> Examples of cases where the Arkansas Supreme Court has found substantial evidence of bad faith include where an insurance agent lied by stating there was no insurance coverage (*Southern Farm Bureau,* 934 S.W.2d at 532); aggressive, abusive, and coercive conduct by a claims representative, which included conversion of the insured's wrecked car; (*Viking Insurance Co. v. Jester*, 836 S.W.2d 371 (Ark. 1992)); and where a carrier intentionally altered insurance records to avoid a bad risk (*Employers Equitable Life Ins. Co. v. Williams*, 665 S.W.2d 873 (Ark. 1984)).

*State Auto Prop. & Cas. Ins. Co. v. Swaim*, 991 S.W.2d 555, 560-61 (Ark. 1999) (internal citations omitted).

In this case, Mr. Hatcher alleges that MDOW has acted in bad faith in three specific ways: MDOW's increased offer of settlement, MDOW's alleged unilateral change in Mr. Hatcher's policy, and MDOW's alleged forcing of Mr. Hatcher to live in a travel trailer. "A mistake on an insurance carrier's part or negligence or confusion or bad judgment will not suffice to substantiate the tort of bad faith." *Swaim*, 991 S.W.2d at 560; *see Moore v. Shelter Mut. Ins. Co.*, No. CIV. 13-2092, 2014 WL 3547020, at *2 (W.D. Ark. July 17, 2014) ("While the manner in which Plaintiff's claim was handled was unfortunate, poor business policies alone do not meet the threshold of bad faith."); *Ark-La-Tex Well Serv., LLC v. Bituminous Cas. Corp.*, Case No. 09-CV-4135, 2010 WL 5169072, at *2 (W.D. Ark. Dec. 14, 2010) ("Without any evidence of malice or ill will on the part of Bituminous, its failure to pay the Well Service's $650,000 demand does not amount to the tort of bad faith.").

This Court concludes that, based on the record evidence, no reasonable juror could conclude that MDOW's valuation change from $40,550.02 to $63,593.32 constitutes bad faith. Mr. Hatcher has not provided any record evidence to show that his hiring counsel was the cause of the valuation spike. In contrast, MDOW has attached to its motion for summary judgment an affidavit from Mr. Ford, an independent insurance adjuster with Central Insurance Adjusting, stating that MDOW asked him to increase his valuation in accordance with Robert Hatcher's

estimate "in an attempt to resolve the claim with Mr. Hatcher" (Dkt. No. 26, Ex. 1, at 2).[1] Specifically, Mr. Ford stated: "The scope of work contained in the estimate submitted by Mr. Hatcher includes numerous repairs that are unnecessary and unrelated to the July 14, 2015, fire loss. [ ] The original estimate that I prepared is the estimate that I believe accurately estimates the actual cash value of the damages caused by the July 14, 2015 fire. The subsequent estimate and tender of $62,593.32 to Mr. Hatcher was an attempt to resolve the claim with Mr. Hatcher based upon the claimed scope of work contained in Mr. Hatcher's estimate." (Dkt. No. 26, Ex. 1, at 2).

The record evidence indicates that MDOW was attempting to meet the requests of Mr. Hatcher in an effort to resolve the claim, not acting in bad faith. Mr. Hatcher attempts to rely upon a September 3, 2015, Forth Report to MDOW attached to Mr. Ford's deposition in an effort to discredit Mr. Ford's affidavit. (Dkt. No. 43, at 9). Mr. Hatcher also attempts to cast doubt on Mr. Ford's claims about the extent of the smoke damage (Dkt. No. 43, at 9). None of the evidence to which Mr. Hatcher points contradicts Mr. Ford's affidavit or provides a basis for this Court to disregard Mr. Ford's affidavit.

Mr. Hatcher has failed to meet proof with proof; he has submitted no record evidence that demonstrates the increased valuation was prepared and submitted solely because Mr. Hatcher hired legal representation. Mr. Hatcher has the burden at this point of coming forward with specific facts that establish a genuine dispute of material fact. He has not done so. Further, Mr. Hatcher cites no legal authority for the proposition that, even if that allegation were true, it would satisfy

---

[1] MDOW attaches to its motion for summary judgment an electronic mail message sent from MDOW's counsel to Mr. Hatcher's counsel dated November 3, 2015, in which MDOW revised its estimate to $63,5903.32; the content of the message supports MDOW's position and the statements in Mr. Ford's affidavit regarding this estimate (Dkt. No. 26-2). Because this document was prepared by counsel, the Court has not considered it when ruling on the motion for summary judgment. However, this evidence undercuts any suggestion by Mr. Hatcher of recent fabrication by MDOW during the litigation.

the requirements to demonstrate bad faith under Arkansas law on the undisputed record evidence here.

Mr. Hatcher also claims that MDOW acted in bad faith when MDOW purportedly unilaterally changed a material portion of the policy and thereby significantly decreased Mr. Hatcher's benefits without decreasing his premiums (Dkt. No. 42, ¶ 2). MDOW contends by way of several affidavits in the record that the policy at issue has always been an "actual cash value" policy (*See* Dkt. No. 26-4; Dkt. No. 33-1; Dkt. No. 60-1). Mr. Hatcher argues that the policy he assented to did not contain the "actual cash value" endorsement and that the "actual cash value" endorsement was added after he obtained the policy. Mr. Hatcher asserts that the argument about the alleged unilateral policy change is essentially the same argument submitted in support of his motion for partial summary judgment; thus he contends that he will not repeat the same in his response in opposition to the motion for summary judgment (Dkt. No. 43, at 9). Accordingly, the Court will address the claim of the alleged unilateral contract alteration in the section of this Order discussing Mr. Hatcher's motion for partial summary judgment. For the reasons explained, the record evidence on this point, viewed in the light most favorable to Mr. Hatcher and giving Mr. Hatcher the benefit of all reasonable inferences, does not aid Mr. Hatcher in defeating MDOW's motion for summary judgment on his bad faith claim.

Lastly, Mr. Hatcher maintains that MDOW acted in bad faith by stating that Mr. Hatcher agreed to living expenses of $40 per day when Mr. Hatcher did not in fact agree, thereby forcing Mr. Hatcher to live in a travel trailer (Dkt. No. 42, at 5-7). In Mr. Ford's affidavit proffered by MDOW, Mr. Ford contends that he offered to pay to Mr. Hatcher $40 per day for living expenses (Dkt. No. 26, Ex. 1, at 2). During his deposition, Mr. Ford testified consistently with the statements made in his affidavit. He testified that, the day after the claim was submitted, he went to Mr.

Hatcher's house and reached an oral agreement with Mr. Hatcher for additional living expenses of $40 per day (Dkt. No. 44, Ex. 1, at 54). He recalled Mr. Hatcher, and "the other guy," who may have been Mr. Hatcher's son Travis Hatcher, were present when the agreement was reached (*Id.* at 55).

Mr. Hatcher's affidavit does not address this point (Dkt. No. 31, Ex. A). Mr. Hatcher was asked about this during his deposition on December 7, 2016. He testified in pertinent part as follows:

> Q. And in terms of living in the trailer, did you discuss that issue with the adjustor Brett Ford?
>
> A. I don't know if I – what you – exactly what you are talking about. But the adjustor and my boy, who is here today, Travis, standing right out in front of the trailer – when he found out I was going to stay in the trailer, they made an agreement between them two. I did not have anything to do with it.
>
> Forty dollars a day for the trailer. And they did not stick with it at all. I think they paid one payment, but it didn't specify. What it was and everything else – they sent me a check for a little over a thousand dollars.
>
> Q. Did they send you a check for $5,000?
>
> A. They sent a check for living expense first for $5,000. And believe me. It took every bit of it. You try to live in – like that trailer – it didn't have no stove in it or nothing. You had to buy every bit of the food you – it was some expense that went on there.
>
> . . .
>
> Q. Okay. So they paid you $5,000. And then you said there was another check you remember for a thousand?
>
> A. A thousand dollars. I'm thinking it was just over a thousand dollars, but it didn't – it come to me, but it didn't specify. I was under the agreement that they would take care of him theirself.
>
> Q. Him?
>
> A. Travis.
>
> Q. Why would they take care of Travis?

13

> A. On the trailer because they made the agreement. I didn't make no agreement, if you understand what I am talking about.
>
> . . .
>
> Q. That agreement – did you – okay. The adjustor talked with Travis about it?
>
> A. Right. That was a camping trailer now. We understand that was a camping trailer that – we moved in there shortly after the fire.
>
> Q. Did you want to stay on the property?
>
> A. Yes. He did not offer to carry me to a motel or anything. I had done got the camper, and he asked me would it be fine. And I said, "I would rather stay here on the property."
>
> And that is when he told Travis – he said, "What about $40 a day for the camper?"
>
> And Travis said, "Fine."

(Dkt. No. 44, Ex. 11, at 90 – 92). Mr. Hatcher now contends that Mr. Ford spoke with Travis Hatcher, Mr. Hatcher's son, regarding reimbursement for living in his travel trailer (Dkt. No. 42, at 4).

MDOW maintains, and Mr. Hatcher admits, that Mr. Hatcher was already living in the travel trailer before Mr. Ford even conducted his initial valuation after the July 14, 2015, fire (Dkt. No. 28, ¶ 9). When asked by Mr. Ford, Mr. Hatcher said that he wanted to stay on the property after the fire (Dkt. No. 44, Ex. 11, at 90-92). Further, the undisputed record evidence currently before the Court shows that MDOW unconditionally tendered checks to Mr. Hatcher totaling $82,190.09 (Dkt. No. 28, at 2-3; Dkt. No. 42, at 4). On the undisputed record evidence, viewing the evidence in the light most favorable to Mr. Hatcher and construing all reasonable inferences in his favor, the Court determines that no reasonable juror could conclude that MDOW caused Mr. Hatcher to "suffer under untenable living conditions" or that MDOW's actions were oppressive or in bad faith under Arkansas law. Even accepting Mr. Hatcher's version of events as true, a mistake

on an insurance carrier's part or negligence or confusion or bad judgment will not suffice to substantiate the tort of bad faith. *See, e.g., Southern Farm Bureau*, 934 S.W.2d at 527; *Affiliated Foods Southwest,* 912 S.W.2d at 8; *American Health Care*, 886 S.W.2d at 588; *Parker*, 341 S.W.2d at 36.

MDOW is entitled to summary judgment on Mr. Hatcher's bad faith claim. This claim is dismissed with prejudice.

### B. Mr. Hatcher's Motion For Partial Summary Judgment

Mr. Hatcher also claims that MDOW acted in bad faith when MDOW unilaterally changed a material portion of the policy which significantly decreased Mr. Hatcher's benefits without decreasing his premiums. (Dkt. No. 42, ¶ 2). MDOW states that the policy at issue has always been an "actual cash value" policy (*See* Dkt. No. 26, Ex. 4). Mr. Hatcher contends that the policy he assented to did not contain the "actual cash value" endorsement and that the "actual cash value" endorsement was added after he obtained the policy.

MDOW denies that the policy of insurance attached as Exhibit B to Mr. Hatcher's motion for partial summary judgment is a full and complete copy of Policy No. ARP_H120161-15, which is Mr. Hatcher's policy. In its response to Mr. Hatcher's motion, MDOW has attached an affidavit from James Gerzetich in which Mr. Gerzetich discusses and provides every policy issued by MDOW to Mr. Hatcher since its inception in 2011 (Dkt. No. 33, Ex. A). The 2015 policy, ARP_H120161-15, is also attached to the affidavit as Exhibit E. Exhibit E to Mr. Gerzetich's Affidavit is the same policy that Mr. Hatcher originally attached to his complaint as Exhibit A. MDOW admitted in its answer to Mr. Hatcher's complaint that the policy was accurate (Dkt. No. 5). MDOW also contends that that policy is the same policy that Mr. Hatcher produced in his initial disclosures in this case (Dkt. No. 33, at 1). MDOW states that Mr. Hatcher attached as

15

Exhibit A to his complaint a correct copy of Policy No. ARP_H120161-15 and cannot now claim that the allegations contained in his complaint are false.

Further, MDOW argues that the policy attached by Mr. Hatcher as Exhibit B to the instant motion does not include the Declaration's Page (Dkt. No. 33, at 1). MDOW maintains that "an insurance policy makes no sense without a Declaration's Page. The Declaration's Page provides essential information such as the policy number, the name of the insured, the insured property, effective dates of coverage, coverage amounts and deductibles" (*Id.*). MDOW goes on to contend that "there are also 13 forms attached to the actual policy. None of the forms, specifically including Form HO4815 (01/06) ACTUAL CASH VALUE, is included by the Plaintiff in Exhibit B to his Motion for Summary Judgment." (*Id.*, at 1-2).

MDOW notes that there are references to the Declaration's Page throughout the policy and that the policy contains a cover letter to Mr. Hatcher dated December 9, 2014, which specifically references that the Declaration's Page is attached. The policy also includes the following statement:

**AGREEMENT**
This policy, subject to all of its "terms," provides the described insurance coverages during the policy period. In return "you" must pay the required premium. Each of the Principal Coverages described in this policy applies only if a "limit" is shown on the "declarations" for that coverage.

(Dkt. No. 33, at 2). "Declarations" is defined on page two of the policy (*Id.*).

MDOW contends that Mr. Hatcher's policy renewed each year and always provided for actual cash value coverage (Dkt. No. 26, Ex. 4). MDOW argues that Mr. Hatcher's affidavit that states that he did not assent to the actual cash value clause in his policy is contradicted by his under oath testimony, citing to testimony given during Mr. Hatcher's deposition taken on September 18,

2015 (Dkt. No. 33, Ex. 2). During that deposition, Mr. Hatcher was asked the following question and gave the following answer:

> Q . . . . and you know you had an actual cash value policy. Right?
>
> A. Right, uh-huh.

(Dkt. No. 33, Ex. 2, at 19).

Based on the record evidence before it, the Court finds that Mr. Hatcher is not entitled to partial summary judgment on the dispute he characterizes as the alleged unilateral policy change by way of endorsement. Therefore, the Court denies Mr. Hatcher's motion for partial summary judgment (Dkt. No. 31). Also, the Court is not persuaded by Mr. Hatcher's motion or the supplemental material filed in support of his motion to strike the actual cash value endorsement present in Mr. Hatcher's insurance policy at issue, despite Mr. Hatcher's request that the Court do so.

## IV. Conclusion

The Court concludes, based on the record evidence taken in a light most favorable to Mr. Hatcher, that there are no genuine issues of material fact in dispute regarding Mr. Hatcher's bad faith claims against MDOW. Therefore, the Court grants MDOW'S motion for summary judgment on Mr. Hatcher's claims against it pertaining to bad faith (Dkt. No. 26). The Court concludes that genuine issues of material fact are in dispute regarding Mr. Hatcher's motion for partial summary judgment; therefore, the Court denies Mr. Hatcher's motion for partial summary judgment (Dkt. No. 31). The Court denies the pending motion to compel as moot, as the parties have indicated in their status reports to the Court that they have resolved the issue referenced in the motion (Dkt. Nos. 16, 18).

So ordered this 15th day of May, 2017.

                                              _____
                                              Kristine G. Baker
                                              United States District Judge